# PELTON GRAHAM LLC

111 BROADWAY, SUITE 1503, NEW YORK, NEW YORK 10006
T 212.385.9700 ‖ F 212.385.0800 ‖ WWW.PELTONGRAHAM.COM

**BRENT E. PELTON, ESQ.**                                    SEPTEMBER 11, 2019
PELTON@PELTONGRAHAM.COM

**VIA ECF**

Hon. Analisa Torres
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

> Re:   *Scott Himrod v. Cooper Works Inc., et al.*
>        <u>Civil Action No. 19 Civ. 03815 (CS)</u>

Dear Judge Torres:

This office represents named plaintiff Scott Himrod ("Himrod" or "Plaintiff") with respect to his claims against Defendants Cygnus Medical, LLC ("Cygnus"), Madison Polymeric Engineering Inc. ("Madison Polymeric" and, together with Cygnus, the "Corporate Defendants"), Shaun Sweeney ("Sweeney") and Walter L. Maguire, Jr. ("Maguire" and, together with Sweeney, the "Individual Defendants" and, collectively with the Corporate Defendants, the "Defendants") in the above-referenced matter. This letter is submitted on behalf of all parties pursuant to the Fair Labor Standards Act ("FLSA") and the Second Circuit's decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015). Counsel for the parties respectfully submit that the attached negotiated Settlement Agreement (Exhibit A) constitutes a fair and reasonable compromise of this matter which should be approved by the Court.

## I.    Procedural History and Plaintiff's Allegations

Plaintiff Himrod commenced this action by sending a demand letter and initial damages analysis based on his best estimates of hours worked and wages paid to Defendants Sweeney and Maguire on February 27, 2019. After several weeks of not hearing from Defendants, Plaintiff Himrod filed his Collective Action Complaint against Defendants on April 17, 2019, alleging unpaid overtime premiums pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* and New York Labor Law ("NYLL"), §§ 650 *et seq.*, as well as wage notice and wage statement violations under the NYLL. (*See* Dkt. No. 1). Defendants filed their Answer on May 16, 2019, denying all material allegations. (Dkt. No. 20). On May 17, 2019, the Court referred the case to the SDNY Mediation Office for settlement purposes, as part of the Court's pilot program for cases involving FLSA claims. (Dkt. No. 22).

In preparation for the mediation, the parties engaged in an informal document exchange. On June 14, 2019, July 21, 2019 and July 29, 2019, Plaintiff produced certain e-mails from Defendant Sweeney, Cygnus/Madison Polymeric Financial Controller Katherine Belmont ("Belmont") and Himrod's manager, Brian Katz ("Katz"), paystubs and invoices from Cygnus and a time card for the week of July 7, 2017. On July 29, 2019, Defendants produced certain forms containing Himrod's contact information and annual salary, certain e-mails from Katz, Belmont, Sweeney and Maguire, statements showing certain hours invoiced to Cygnus in March, April and May 2017 and a Check History Detail report for the period between October 4, 2014 and December 22, 2018. The parties subsequently participated in a full-day mediation with Elena J. Voss, Esq. of the SDNY Mediation Program on August 13, 2019, where an agreement was reached on all issues.

## II.    The Settlement Accounts for Litigation Risk

Throughout this litigation, the parties have held significantly different viewpoints on the underlying facts of this matter and Defendants' potential liability. Fundamentally, the parties dispute the number of hours that Plaintiff worked. Plaintiff alleges that he worked for Defendants' medical products manufacturing and repair company as a surgical instrument repair specialist from in or around late September 2014 through in or around May 2015 and again from approximately October 2016 through late December 2018 (collectively, the "Himrod Employment Period").

Plaintiff alleges that he performed handheld surgical instrument repair work for Defendants in the back of an Isuzu NPR box truck for approximately the first seven (7) months of his employment, and subsequently in metal repair shops in the basements of Mount Sinai Beth Israel – Petrie Division (hereinafter "Beth Israel Petrie"), located at 281 1st Avenue, New York, NY 10003, and Mount Sinai Hospital, located at 1468 Madison Avenue, New York, NY 10029 (hereinafter "Mount Sinai Uptown"). At various times throughout his employment, Himrod serviced four (4) hospitals in Manhattan, New York: Beth Israel Petrie, Mount Sinai Beth Israel Phillips Ambulatory Care Center (hereinafter "Beth Israel PACC"), located at 10 Union Square East, New York, NY 10003; New York Eye & Ear Infirmary of Mount Sinai (hereinafter "NY Eye & Ear" and, collectively with Beth Israel Petrie and Beth Israel PACC, the "Downtown Hospitals"), located at 310 East 14th Street, New York, NY 10003; and Mount Sinai Uptown. Throughout his employment, Plaintiff Himrod alleges that he additionally performed certain work at the Cygnus Medical repair shop, located at 7 Kulick Road, Fairfield, New Jersey 07004, on weekends. Plaintiff alleges that he typically worked sixty to eighty (60-80) hours, and sometimes as many as one hundred (100) hours, per week throughout his employment with Defendants.

From the beginning of the Himrod Employment Period to in or around May 2015, Plaintiff Himrod was paid a fixed salary of sixty-five thousand dollars ($65,000.00) per year. At the start of Plaintiff's second period of employment with Defendants, starting in or around October 2016, Plaintiff's salary was increased to seventy thousand dollars ($70,000.00) per year. Plaintiff alleges that in or around March or April 2017, he participated in a conference call with Defendants Sweeney and Maguire during which Defendants informed him that, in order to avoid paying him overtime premiums, Defendants would instead pay him as an "independent contractor," such that he would be required to bill all of the hours that he worked at a fixed "straight time" rate. Plaintiff alleges that during the period that he was classified as an independent contractor, he was paid at a

rate of thirty-three dollars and sixty-five cents ($33.65), at straight time, based on his former salary of seventy thousand dollars ($70,000.00) divided by 2,080 hours per year, for all hours for which he received compensation, which he was instructed to invoice to Cygnus Medical, LLC. As discussed in more detail below, the parties dispute whether Plaintiff Himrod was a bona fide independent contractor and thus, whether he was entitled to overtime premiums, during this period.

Plaintiff further alleges that in or around May 2017, he participated in another conference call with Sweeney and Maguire during which they informed him that Defendants were going to reclassify him as an employee and give him a ten thousand dollar ($10,000.00) raise to eighty thousand dollars ($80,000.00) per year. It is Plaintiff's belief that his salary was intended to cover no more than eighty (80) hours per two (2)-week pay period, or 2,080 hours per year such that he did not receive wages of any kind, much less overtime premiums, when he worked in excess of eighty (80) hours in a biweekly pay cycle. Plaintiff further alleges that he did not receive a proper wage notice at any point during his employment with Defendants and that, because his paystubs routinely showed a maximum of eighty (80) hours per two (2)-week pay period during the periods that he was paid a salary, he did not receive an accurate wage statement showing a complete accounting of the number of hours that he worked.

Defendants have vigorously denied Plaintiff's allegations regarding the number of hours that he claims to have performed work for Defendants and allege that prior to the mediation, they were in the process of gathering certain security footage and records that would have proved that Plaintiff worked substantially fewer hours than alleged in the Complaint. Defendants additionally point to certain March 2017 statements of hours worked during the period that Himrod was classified as an independent contractor which show that Himrod worked forty-one (41) and forty-two (42) hours per week during the March 22, 2017 through March 30, 2017 and April 3, 3017 through April 14, 2017 pay cycles, respectively. It is Plaintiff's assertion that these two (2) statements in particular were issued during the period that Himrod was transitioning to the "independent contractor" role and reflected hours worked above the eighty (80) hours for which he was compensated on his payroll check.

Significantly, Defendants argue that Plaintiff Himrod was exempt from overtime compensation pursuant to the Motor Carrier Act during his entire first period of employment, during which he was required to drive a commercial box truck from Cygnus's Fairfield, New Jersey office to Manhattan, where he picked up and repaired surgical instruments for the three (3) Downtown Hospitals in the back of his truck. While it is true that the repair truck that Plaintiff drove during his first period of employment was likely a "commercial motor vehicle" having a gross vehicle weight of at least 10,001 pounds and that Himrod was required to drive the truck across state lines from New Jersey to New York, it is Plaintiff's position that his primary job duties as a surgical instrument repair specialist did not directly affect the safety of operation of motor vehicles in transportation on public highways in interstate commerce within the meaning of the Motor Carrier Act. However, Plaintiff acknowledges that if Defendants were to prevail on this argument entirely, Himrod would not be entitled to unpaid overtime damages for the first portion of his employment, from approximately September 2014 through May 2015, for which Plaintiff calculated approximately $35,156.25 in unpaid overtime premiums.

Defendants additionally assert that Plaintiff was exempt from overtime premiums during the period that he was classified as an independent contractor. Specifically, Defendants point to the fact that Himrod invoiced hours worked to Cygnus, was required to secure his own health insurance and was allegedly free to exercise discretion with respect to the specific hours that he worked and the manner in which the work was performed, with only modest, if any, supervision or direction from Cygnus. Plaintiff alleges that he was deliberately misclassified by Defendants in order to avoid paying him overtime and that he did not experience any appreciable changes to his job duties during the period that he was classified as an independent contractor. Plaintiff Himrod additionally alleges that he continued to use the same Cygnus Medical I.D. badge that he had been issued at the start of his employment period and that Defendants provided all of the equipment and tools that he used within the hospital and Fairfield repair shops.

Defendants additionally dispute the liability of Madison Polymeric as Plaintiff's "employer." Specifically, although Defendants acknowledge that there was some common ownership between Madison Polymeric and Cygnus, that certain employees, including a financial controller, performed work for both companies and that the companies shared corporate offices in Branford, Connecticut, they ultimately allege that Madison Polymeric is an entirely separate company specializing in the manufacture of custom foam products and protective packaging materials that did not employ Plaintiff Himrod.

During Plaintiff's first period of employment with Defendants, Plaintiff alleges that he clocked in and out at Defendants' Fairfield, New Jersey office when he picked up and dropped off his repair truck. During Himrod's second period of employment, from 2016 through 2018, Plaintiff alleges that he clocked in and out using a time clock at Mount Sinai Uptown. Although there was a time clock at Beth Israel Petrie, Plaintiff alleges that it was typically broken such that he had to write in the times he arrived at and left from the Downtown Hospitals by hand. As of the date of this submission, Defendants have not provided records, excepting certain statements of hours invoiced during the period that Himrod was classified as an independent contractor, showing an accurate accounting of the total number of hours that Himrod worked. To the extent that Defendants are not able to produce records showing the number of hours that Plaintiff worked, he would be able to rely on his testimony as to the extent of his work as a matter of just and reasonable inference. While Plaintiff believes that a factfinder would credit his testimony over the Defendants, Plaintiff recognizes that any lack of documents demonstrating the hours worked could potentially limit the amount of damages he could recover at trial regarding his unpaid overtime claims if a factfinder credited Defendants' testimony in its entirety.

Due to the fact-intensive nature of the Plaintiff's claims, it is likely that substantive answers to these disputed issues would not be resolved until after extensive written and deposition discovery, followed by summary judgment briefing, if not a trial. Plaintiff intended to file a motion for conditional certification of a FLSA collective action and dispositive motion on certain of the disputed legal issues as described above. Defendants would strongly oppose such motions and would have sought to decertify the collective action. Based on these disputes, the parties engaged

in good-faith, arm's-length settlement negotiations regarding not only Plaintiff's FLSA claims, but also his pendent common law and state law claims.[1]

In advance of the August 13, 2019 mediation, Plaintiff's counsel created a damages analysis based on a combination of Defendants' payroll records and Plaintiff's best recollection of the hours that he worked. The analysis resulted in $212,639.08 in unpaid overtime premiums. When wage notice and wage statement, liquidated damages under the FLSA and NYLL and statutory interest on the NYLL claims at 9% per annum were added to Plaintiff's "actual" damages, the total alleged damages came out to $485,955.15. Specifically, because it is Plaintiff's understanding that he was only compensated for a maximum of eighty (80) hours per two (2)-week pay period during the portions of his employment that he was paid on a salary basis, Plaintiff calculated unpaid overtime by multiplying one and one-half (1.5) times his hourly rate (i.e., his annual salary amount divided by 2,080 hours) by the number of hours that he worked in excess of forty (40) per week. During the period that Himrod was classified as an independent contractor and paid straight time for the hours that he invoiced to Defendants, Plaintiff calculated unpaid overtime damages by multiplying his regular hourly rate by 0.5 for all hours that he worked in excess of forty (40) each week. As mentioned above, Defendants dispute that Himrod was entitled to overtime premiums during the period that he drove a box truck, from in or around late September 2014 through in or around May 2015, for which Plaintiff calculated $35,156.25 in unpaid overtime premiums, and the period that Himrod was classified as an independent contractor, from in or around March 2017 through May 2017, for which Plaintiff calculated $2,848.46 in unpaid overtime premiums.

In light of the significant litigation risks outlined above, the parties believe that this settlement is fair and reasonable. Although there is a possibility that Plaintiff could recover higher damages if the case proceeded to trial, there is also the possibility that he could receive much lower damages, or nothing at all. Moreover, Plaintiff will be able to recover settlement funds more expeditiously, and with more certainty, than a trial judgment, since the parties would need to proceed with formal discovery, including depositions, and brief numerous motions on the merits and class and collective treatment before trial could commence.

## III.    Settlement Terms

As set forth in the attached Settlement Agreement, the parties have agreed to settle this action for a total settlement amount of $132,500.00 (the "Settlement Amount"). Of that amount, $45,467.50 is payable to Plaintiff's counsel, including $1,951.31 in expenses for counsel's costs for filing and service of the complaint and Himrod's transportation and lodging for the August 13, 2019 mediation, plus attorneys' fees in the amount of one-third (33.33% of the Settlement Amount, after subtracting those expenses (i.e., $43,516.19). The remaining $87,032.50 is payable directly to Plaintiff (the "Net Settlement Amount").

---

[1] Such claims, of course, may be waived by private agreement. *Amaya v. Garden City Irrigation, Inc.*, 2011 U.S. Dist. LEXIS 15316, at *4-5 (E.D.N.Y. Feb. 15, 2011).

Keeping in line with the trend in this Circuit following *Cheeks*, the parties have agreed to a wage-and-hour release for any claims arising before Plaintiff signed the Settlement Agreement. The parties also did not include a confidentiality provision and have specifically included language in the Agreement making it clear that nothing in the Agreement precludes the parties from truthfully communicating their experiences concerning the Action or Settlement.

The agreement includes a mutual non-disparagement provision. The parties recognize that Courts have held that broad one-sided non-disparagement provisions "can be contrary to public policy because they prevent the spread of information about FLSA actions to other workers (both employees of Defendants and others), who can then use that information to vindicate their statutory rights." *Gaspar v. Pers. Touch Moving, Inc.*, No. 13 Civ. 8187 (AJN), 2015 U.S. Dist. LEXIS 162243, *3 (S.D.N.Y. Dec. 3, 2015). However, not every non-disparagement clause in a FLSA settlement is *per se* objectionable. *See Lopez v. Nights of Cabiria LLC*, 96 F. Supp. 3d 170, 180 n.65 (S.D.N.Y. 2015). Here, the non-disparagement clause contained in this agreement is permissible for two reasons:

1) Initially, the non-disparagement provision is mutual and binds Plaintiffs and Defendants. Following *Cheeks*, Courts have approved settlements containing mutual non-disparagement clauses. *See Sadana v. Park Li, Ltd.,* No. 15-CV-8772, 2015 U.S. Dist. LEXIS 19122, at *2-3 (S.D.N.Y. Feb. 17, 2016) (approving the inclusion of a mutual non-disparagement clause in a FLSA settlement agreement); *Caprile v. Harabel*, No. 14-CV-6386, 2015 U.S. Dist. LEXIS 127332 at *3 (S.D.N.Y. Sept. 17, 2015) (post *Cheeks* decision approving mutual non-disparagement clause but rejecting the inclusion of a confidentiality provision).

2) Moreover, in recognition of the public policy interest favoring the disclosure of information relating to this action, the non-disparagement clause contains a "carve-out" provision permitting the Parties to make truthful statements about their experience in this litigation. Courts have held that such a "carve-out" provision provides an equitable balance between Plaintiffs' rights under the FLSA, and Defendants' interest in preventing the dissemination of defamatory statements. *See Cionca v. Interactive Realty LLC*, No. 15-CV-05123 (BCM), 2016 U.S. Dist. LEXIS 77372 at *8 (S.D.N.Y. July 10, 2016) (a clause which bars a plaintiff from making negative statements about a defendant "must include a carve-out for truthful statements about [a plaintiff's] experience in litigating [her] case."); *Lopez v. Poko-St. Anns L.P.,* No. 15-CV-4980 (BCM), 2016 U.S. Dist. LEXIS 46862 at fn. 1 (S.D.N.Y. April 4, 2016) (approving bilateral non-disparagement clause containing a "carve-out" provision for truthful statements); *Panganiban v. Medex Diagnostic & Treatment Ctr. LLC,* No. 15-CV-2588 (AMD)(LB), 2016 U.S. DIST LEXIS 29158 at * 6 (E.D.N.Y. Mar. 7, 2016) (approving reciprocal non-disparagement clause with a "carve out" for truthful statements about [plaintiff's] experience litigating the FLSA action); *Cortes v. New Creators, Inc*., No. 15 Civ. 5680, 2016 U.S. Dist. LEXIS 79757, *4 (S.D.N.Y. June 20, 2016) (approving non-disparagement clause that "includes the requisite 'carve-out' for truthful statements about plaintiffs' experience litigating this case").

As well, the mutual non-disparagement clause is bolstered by additional provisions that permit either party to commence an action in the event of a breach of the agreement and to obtain reasonable attorneys' fees in the event that they prevail.

## IV.    Plaintiff's Attorney's Fees and Expenses

As set forth in the attached Affidavit of Brent E. Pelton, Esq. (Exhibit B), as of September 11, 2019, Plaintiff's counsel has spent more than 68 hours in prosecuting and settling this matter, resulting in a lodestar of $22,530.56. Plaintiff's counsel has spent $1,951.31 in actual litigation costs. The portion of the settlement amount that plaintiff seek as attorneys' fees (i.e. $45,467.50) represents one-third (1/3) of the settlement amount, after subtracting the actual litigation costs, which is approximately 2.23 times the lodestar amount, which courts routinely find to be within the reasonable range awarded. *See, e.g.*, *Kemp-Delisser v. St. Francis Hosp. & Med. Ctr.*, 2016 U.S. Dist. LEXIS 152496, *51 (D. Conn. 2016) (approving a multiplier of 2.77 as "well within the range of lodestar multipliers that are regularly approved by district courts in the Second Circuit"); *Fujiwara v. Sushi Yasuda, Ltd.*, 58 F. Supp. 3d 424, 439 (S.D.N.Y. 2014) Approving a multiplier of 2.28 and concluding that "a multiplier near 2 should, in most cases, be sufficient compensation for the risk associated with contingent fees in FLSA cases.").

In addition, this amount is consistent with what was agreed upon between the Plaintiff and his counsel in his retainer agreement. The retainer agreement between the Named Plaintiff and his set forth a contingency fee of one-third (1/3) of any settlement, plus reimbursement of actual litigation costs. This too is in line with decisions in this Circuit which routinely award one-third of the settlement fund as attorneys' fees in wage and hour cases. *DeLeon v. Wells Fargo Bank, N.A.*, No. 12 Civ. 4494, 2015 U.S. Dist. LEXIS 65261, at *13 (S.D.N.Y. May 7, 2015) (one-third); *Sukhnandan v. Royal Health Care of Long Island LLC*, No. 12 Civ. 4216, 2014 U.S. Dist. LEXIS 105596, at *26-*28 (S.D.N.Y. July 31, 2014) (33.33%); *Willix v. Healthfirst, Inc.,* No. 07 Civ. 1143, 2011 U.S. Dist. LEXIS 21102, at *15-*16 (E.D.N.Y. Feb. 18, 2011) (33%); *Johnson v. Brennan*, No. 10 Civ. 4712, 2011 U.S. Dist. LEXIS 105775, at *54-*55 (S.D.N.Y. Sept. 16, 2011) (33%).

The hourly billing rates utilized by Plaintiff's counsel in calculating the lodestar are within the range paid to attorneys of similar experience and professional focus in the Southern District of New York. In fact, similar rates have been approved in connection with a recent wage and hour settlement in the Eastern District, which customarily has slightly lower rates than the SDNY. *See Hall v. Prosource Techs., LLC*, 14-cv-2502, 2016 U.S. Dist. LEXIS 53791 at *38-41 (E.D.N.Y. April 11, 2016). Accordingly, Plaintiff's counsel submits that the attorney's fees component of the settlement is fair and reasonable.

For the purposes of this settlement, Defendants take no position with respect to Plaintiff's counsel's request for attorneys' fees.

## V.    The Parties Believe that the Settlement Is Fair and Reasonable

An FLSA settlement should receive judicial approval where it is "fair and reasonable." *See Cheeks*, *supra*; *Wolinsky v. Scholastic, Inc*. 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).[2] Generally, there is a "strong presumption in favor of finding a settlement fair," as "the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Crabtree v. Volkert, Inc*., No. 11-cv-0529, 2013 U.S. Dist. LEXIS 20543, at *8 (S.D. Ala. Feb. 14, 2013). Moreover, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes." *In re Penthouse Executive Club Compensation Litig*., No. 10-cv-1145, 2014 U.S. Dist. LEXIS 5864, at *22 (S.D.N.Y. Jan. 14, 2014) (noting that the inherent adversarial nature of a litigated FLSA case is adequate indicator of fairness of settlement). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a 'reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Le v. SITA Info. Networking Computing USA, Inc.*, No. 07-cv-86, 2008 U.S. Dist. LEXIS 20786 at *2 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food,* 679 F.2d at 1354). Although the FLSA places "limits on an employee's ability to waive claims . . . for fear that employers would [otherwise] coerce employees into settlement and waiver," *Wolinsky*, 900 F. Supp. 2d at 335 (alteration in original) (internal quotation marks omitted), "these concerns are not as relevant when the plaintiffs no longer work for the defendant, as is the case here." *Cisneros v. Schnipper Restaurant LLC*, No. 13-cv-6266, 2014 U.S. Dist. LEXIS 2111, *3 (S.D.N.Y. Jan. 8, 2014).

Here, there is no question that the settlement did not come about because of "overreaching" by the employer. To the contrary, the settlement was the result of vigorous arm's-length negotiations, including a full-day mediation with Elena J. Voss, Esq. of the SDNY Mediation Program. The parties are represented by counsel experienced in wage and hour law who duly counseled their respective clients on the benefits and risks of continued litigation. The negotiated settlement is fair and reasonable when considered in the context of the litigation risks faced by Plaintiff and the risk that recovery after trial would be less than the negotiated settlement amount. Settlement at this stage of the case unquestionably constitutes the most efficient and effective conclusion to this litigation. Defendants asserted legitimate substantive defenses which highlighted substantial risk to Plaintiff's ability to continue this FLSA litigation. *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (FLSA protects only minimum wage and overtime). Arm's-length negotiations between knowledgeable counsel followed, culminating in a negotiated resolution.

*       *       *       *       *

As demonstrated above, the settlement is a result of substantial negotiations and compromise by both parties. The parties believe that the settlement is completely fair, reasonable, and adequate to the Plaintiff and respectfully request that the Court approve the Agreement.

---

[2] The parties note that *Cheeks* relies heavily on the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States Dep't of Labor*, 679 F.2d 1350, 1355 (11th Cir. 1982), and that the Eleventh Circuit itself has subsequently contemplated that the supervision doctrine laid out in that case may apply only where a "compromise" of an FLSA claim has occurred. *Silva v. Miller*, 307 Fed. Appx. 349, 351 (11th Cir. 2009).

We appreciate Your Honor's attention to this matter. Please contact the undersigned counsel for the parties should you have any questions regarding this submission.

Respectfully submitted,

**PELTON GRAHAM LLC**

By: ___*/s/ Brent E. Pelton*_____
Brent E. Pelton, Esq.
Taylor B. Graham, Esq.
111 Broadway, Suite 1503
New York, New York 10006
Tel.: (212) 385-9700

*Attorneys for Plaintiff*

Enclosures

cc:     Scott R. Green, Esq. (via ECF)